MIGUEL A. AYALA,
   Plaintiff,

v.               Case No. 20-C-1727

DANIEL HOPPE and
FAITH EDWARDS,
   Defendants.

## ORDER

Plaintiff Miguel A. Ayala is proceeding on Eighth Amendment claims alleging that officials at the Wisconsin Resource Center (WRC) were deliberately indifferent to his medical needs. The defendants filed a motion for summary judgment, ECF No. 23, which the plaintiff opposes, ECF No. 30. I address the motion in this order.

### I. BACKGROUND[1]

The plaintiff was an inmate at WRC during all relevant times. ECF No. 25, ¶ 1. Dr. Daniel Hoppe worked as a Medical Consultant/Psychiatry Officer at WRC from July 22, 2019, through April 8, 2020. *Id.*, ¶ 2. He then worked at the Winnebago Mental Health Institute until May 2, 2021. *Id.* Faith Edwards was the Nursing Supervisor at WRC from

---

[1] Facts in this section are taken from the defendants' proposed findings of fact and declarations in support of their motion for summary judgment. ECF Nos. 25–28. The plaintiff responded to the defendants' proposed facts, ECF No. 30, but few of his responses cite supporting evidence in the record, as the court's rules require. *See* Civil L. R. 56(b)(2)(B)(i)–(ii). I consider admitted any facts that he does not properly contest. *See* Civil L. R. 56(b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission.").

 I also note that the defendants' record of the evidence appears to be incomplete. Several proposed facts cite evidence that does not support those facts. I will consider the proposed facts only where the cited evidence supports them, *see* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii), and will consider arguments in the memoranda only to the extent they properly refer to the proposed facts, *see* Civil L. R. 56(b)(6).

May 12, 2019, through January 14, 2020. *Id.*, ¶ 3. She has been a registered nurse since 1977 and licensed in Wisconsin since 2012. *Id.*

A. **The Plaintiff's Finger Injury and Treatment**

On August 17, 2019, the plaintiff slammed his middle finger in his cell door, severing the tip. *Id.*, ¶ 4. Staff from the Health Service Unit (HSU) put the plaintiff's severed fingertip on ice, provided the plaintiff Tylenol for pain, and transported him to the emergency room at Ascension Northeast Wisconsin Mercy Hospital. *Id.* The hospital discharged the plaintiff later that day with instructions to keep his bandages in place until a follow-up with a hand surgeon, apply ice three to four times per day, keep his hand elevated, and take Tylenol or ibuprofen for pain. *Id.*, ¶ 5; ECF No. 27-1 at 1. Advanced Practice Nurse Prescriber Hanford-Langsine (not a defendant) signed the recommended plan of care reiterating the hospital's instructions. ECF No. 27-1 at 5.

On August 19, 2019, Dr. Reginaldo Arboleda saw the plaintiff for a follow-up on his finger. ECF No. 25, ¶ 7.[2] He noted that the plaintiff was taking ibuprofen for pain and was not in distress, and his finger was not bleeding. *Id.* He reapplied the bandage and increased the plaintiff's prescription for gabapentin to treat his nerve pain ahead of his appointment with a hand surgeon. *Id.*; ECF No. 27-1 at 15–16. Later that day, the HSU entered an order for x-rays on the plaintiff's finger, the prescription for gabapentin, and an extra pillow for two weeks. ECF No. 27-1 at 7. The next day, the HSU entered an order for tramadol for five days to address the plaintiff's pain. *Id.*

---

[2] The complaint named Dr. Arboleda as a defendant, but he passed away after the plaintiff filed this lawsuit. ECF No. 14. I dismissed Dr. Arboleda from this suit after the plaintiff failed to substitute a proper defendant in his place. ECF No. 17.

On August 21, 2019, the plaintiff had an appointment with Dr. Joseph P. Cullen (not a defendant) at the Hand to Shoulder Center of Wisconsin. ECF No. 25, ¶ 10; ECF No. 27-1 at 19–21. Dr. Cullen amputated a portion of the plaintiff's finger. ECF No. 27-1 at 19. He instructed the plaintiff post-surgery to keep his dressing clean and dry, take prescribed antibiotics and ibuprofen as needed for pain, follow-up in two weeks to remove his sutures, and contact the office with questions or to change the dressing earlier. *Id.* at 19–20. He advised the plaintiff to be aware of signs of an infection, including redness, excessive swelling, increased pain, unusual drainage, foul odor, or a fever above 101.5 degrees. *Id.* at 20. The HSU entered an order consistent with Dr. Cullen's instructions the same day. *Id.* at 7.

According to the defendants, early in the morning on August 22, 2019, security staff contacted the HSU after finding the plaintiff lying on the floor of his cell, reporting extreme pain, and unable to sit still. ECF No. 25, ¶ 12. He told staff he had taken Tylenol and used ice packs without any pain relief. *Id.* Nursing staff examined the plaintiff, took his vital signs, and reviewed his chart and medical records. *Id.* His finger dressing was clean, dry, and intact and showed no signs of infection or bleeding. *Id.* (citing ECF No. 27-1 at 13). The defendants state that nursing staff checked on the plaintiff about an hour later, and he reported his pain was "slightly better." *Id.*, ¶ 14 (citing ECF No. 27-1 at 13). But the plaintiff continued pacing, elevating his arm, and applying ice. *Id.*[3]

At 4:17 a.m., nursing staff contacted Dr. Arong (not a defendant), who ordered an immediate dose of tramadol. *Id.*, ¶ 12. The HSU entered an immediate order for tramadol

---

[3] The progress notes cited in these proposed facts do not discuss the early morning incident on August 22, 2019, or the follow-up an hour later. The cited notes discuss only later visits the same day. *See* ECF No. 27-1 at 13 (notes from 7:24 p.m. and 9:53 p.m.).

for "severe hand pain" and later extended the plaintiff's prescription for tramadol to every eight hours for ten days. ECF No. 27-1 at 8. Later that morning, the plaintiff underwent an EMG at Affinity Medical Group in Oshkosh for complaints of numbness in his legs. ECF No. 25, ¶ 16. The reports from this visit do not note any complaints of pain in his hand or finger or dizziness. ECF No. 27-1 at 23–24.

At around 4:00 p.m., back at the prison, security staff contacted the HSU because the plaintiff was asking for additional tramadol and reporting dizziness. ECF No. 25, ¶ 17; ECF No. 27-1 at 13. He filed a request for health services stating that he was "extremely dizzy and [his] pain level is a 10!" ECF No. 27-1 at 40. Security staff assisted the plaintiff to the HSU, where nursing staff took his vitals and performed a neurological assessment. ECF No. 25, ¶ 18. The results of that assessment showed no abnormalities. *Id.*; ECF No. 27-1 at 13. Staff noted a red bump on the plaintiff's forehead above his right eye, which suggested trauma. ECF No. 27-1 at 13. The plaintiff eventually recalled falling when he stood up for inmate count and said he may have hit his head on the wall. *Id.* He reported thirst, fatigue, and a headache. *Id.* Nursing staff encouraged him to drink water and report any nausea or vomiting. *Id.* The plaintiff was able to walk back to his cell and to see visitors in a visiting room. *Id.*

On August 23, 2019, the plaintiff had an appointment with Dr. Arboleda. ECF No. 25, ¶ 19. Dr. Arboleda's notes discuss the plaintiff's finger injury and report of passing out the previous night. ECF No. 27-1 at 17–18. The plaintiff reported difficulty sleeping after the surgery on his finger and continued pain despite taking the prescribed tramadol. *Id.* at 18. Dr. Arboleda did not increase the plaintiff's gabapentin out of concerns that "he

4
Case 2:20-cv-01727-LA    Filed 05/03/22    Page 4 of 16    Document 32

might get more sedated and pass out." *Id.* He instead continued the tramadol, gabapentin, and ibuprofen as previously prescribed and increased the plaintiff's Tylenol. *Id.*

On August 25, 2019, the plaintiff filed a request for health services, noting "stinging sensation in fingers adjacent to one with trauma, stinging is vibrating down arm." *Id.* at 41. An HSU staff member responded and told the plaintiff to use ice on his likely inflamed fingers, as Dr. Arboleda recommended. *Id.* Three days later, the plaintiff requested an extension of his tramadol, which was expiring soon, until his "pain is gone." *Id.* at 42. The HSU extended his prescription until his next appointment with the hand surgeon. *Id.*

On September 1, 2019, the plaintiff reported increased pain in the tip of his injured finger. ECF No. 25, ¶ 22; ECF No. 27-1 at 13. His finger was still wrapped, and HSU staff noted no swelling. ECF No. 27-1 at 13. The plaintiff reported being unable to retrieve his medication that morning, stated he had not slept in two days, and was upset and crying. *Id.* The HSU provided him additional tramadol and Tylenol and reported that he "appeared to be more relaxed" after taking a shower. *Id.* A nurse delivered the plaintiff's medication early the next morning, and he had no additional complaints at that time. *Id.*

On September 3, 2019, the plaintiff saw Dr. Hoppe for a psychiatric appointment, during which he discussed his pain and difficulty sleeping since his injury. ECF No. 25, ¶ 24; ECF No. 27-1 at 27. He requested a higher dose of gabapentin but noted the HSU denied it because of concerns that it could increase his fall risk. ECF No. 27-1 at 27. Dr. Hoppe reported that the plaintiff "appears to be safe at this time despite some apparent agitation due to recent finger injury." *Id.* He prescribed the plaintiff melatonin, a common supplement that the plaintiff reported previously helped him sleep. *Id.*; ECF No. 28, ¶ 7.

On September 4, 2019, the plaintiff filed a request asking the HSU to extend his feed-in-cell restriction because his hand was still wrapped, his stitches had not yet been removed, and he was "shaking so badly" that he needed assistance carrying his food tray. ECF No. 25, ¶ 28; ECF No. 27-1 at 43. The plaintiff returned to Dr. Cullen at the Hand to Shoulder Center later that day. ECF No. 25, ¶ 29. Dr. Cullen removed the plaintiff's bandage and discovered his finger was oozing, swollen, and partially black and necrotic. ECF No. 27-1 at 29. Dr. Cullen performed an emergency irrigation and debridement and further amputation on the plaintiff's finger, which he noted was "clearly significantly infected." *Id.* at 29–30. He prescribed the plaintiff a stronger antibiotic and hydrocodone-acetaminophen for pain. *Id.* at 29. Dr. Cullen instructed the plaintiff not to change his finger dressing until a follow-up appointment in two days. *Id.* at 31. The next day, the HSU extended the plaintiff's feed-in-cell restriction, excused him from classes for four days, and ordered him a prescription for Vicodin. *Id.* at 9, 43.

On September 6, 2019, the plaintiff had his follow-up appointment at the Hand to Shoulder Center. ECF No. 25, ¶ 33. The plaintiff reported no progressive pain and that his finger felt and looked better. ECF No. 27-1 at 35. The doctor saw no signs of infection, re-dressed the plaintiff's wound, and scheduled a follow-up appointment for ten to twelve days or "sooner for problems or questions." *Id.* The HSU followed-up with the Hand to Shoulder Center a few days later, inquiring whether the plaintiff's dressing should be changed at the prison or the Center. *Id.* at 38. Dr. Cullen advised the prison to change the plaintiff's dressing every other day. *Id.* On September 10, 2019, the HSU granted the plaintiff's request to extend his restriction for an additional pillow. *Id.* at 44.

6
Case 2:20-cv-01727-LA    Filed 05/03/22    Page 6 of 16    Document 32

On September 13, 2019, the plaintiff requested a dressing change for his finger, which had been changed earlier that day. *Id.* at 14. The plaintiff reported that the dressing "appears sloppily done," so he "took matters into [his] own hands and changed the dressing [him]self." *Id.* The HSU noted that the dressing appeared altered, but the plaintiff's wound was satisfactorily covered and clean. *Id.* Staff encouraged him not to tamper with his dressing to avoid reinfection. *Id.*

On September 16, 2019, the plaintiff returned to the Hand to Shoulder Center for a follow-up with Dr. Cullen. ECF No. 25, ¶ 36. Dr. Cullen's notes from this visit are not in the record. But the off-site report notes that Dr. Cullen removed the plaintiff's sutures and advised him to keep the dressing on his finger through the weekend, "work on range of motion," and complete his schedule of antibiotics. ECF No. 27-1 at 39. He scheduled a follow-up appointment for four weeks. *Id.* The plaintiff had no questions for the HSU when he arrived back at the prison. *Id.* at 14. The same day, Dr. Hoppe increased the plaintiff's dosage of melatonin, though the record contains no evidence of an appointment with Dr. Hoppe that day. *Id.* at 11.

On September 19, 2019, unit staff reported that the plaintiff's dressing was again removed and contacted the HSU for redressing. *Id.* at 14. HSU staff noted that the plaintiff's finger "was scabbed over and not bleeding" and showed no signs of infection. *Id.* HSU staff washed and covered the plaintiff's finger and reapplied gauze. *Id.* A week later, the plaintiff requested additional material to wrap his finger. *Id.* Unit staff providing the plaintiff's medication examined his finger; saw no sign of infection; and noted his dressing was clean, dry, and intact. *Id.* The HSU made limited additional gauze and adhesive wrap available to the plaintiff. *Id.*

### B. Inmate Complaint

On September 17, 2019, the plaintiff filed an inmate complaint about what he perceived to be inadequate medical treatment of his finger injury that led to the second, purportedly unnecessary amputation. ECF No. 25, ¶ 57; ECF No. 27-2 at 8. He alleged that after the second surgery, Nurse Steve Fahrenkrug (not a defendant) issued him an apology "on the behalf of HSU department due to the fact [he] was not taken serious of [his] complaints of being in pain." ECF No. 27-2 at 9. Fahrenkrug allegedly told the plaintiff "that HSU will take this as a 'learning experience' to prevent it from happening again." *Id.*

An inmate complaint examiner contacted Nursing Supervisor Edwards about the plaintiff's complaint. *Id.* at 1. The complaint examiner thoroughly reviewed the plaintiff's medical records, including his requests for health services, nursing progress notes, and reports from his visits with Drs. Arboleda and Cullen. *Id.* at 1–4. Edwards also reviewed the plaintiff's medical records and determined that the HSU promptly responded to his medical needs and requests. *Id.* at 4. The complaint examiner described the plaintiff's complaint as alleging dissatisfaction "with the care being offered" and concluded that it was "clear from the record" that he was not denied appropriate care. *Id.* The reviewing authority accepted the complaint examiner's recommendation to dismiss the complaint, and the Office of the Secretary dismissed the plaintiff's appeal. *Id.* at 5–7.

### C. Dr. Hoppe's Involvement

Dr. Hoppe avers that he is involved only in inmates' mental-health treatment and does not advise on physical injuries or physical health issues unless there is an emergency. ECF No. 28, ¶ 6. He does not usually prescribe pain medication because his specialty is mental health and not physical-pain management. *Id.*, ¶ 8. Dr. Hoppe defers

to primary care physicians or pain specialists for management of an inmate's physical pain symptoms. *Id.*

Dr. Hoppe was aware that the HSU's providers had prescribed the plaintiff gabapentin, tramadol, and Vicodin for pain. *Id.*, ¶¶ 10–12. He also was aware that Dr. Cullen was the primary provider handling the treatment of the plaintiff's finger amputation. *Id.*, ¶ 12. He noted that Dr. Cullen prescribed antibiotics to prevent infection and instructed the HSU staff on the plaintiff's post-operative care. *Id.* He avers that Dr. Cullen was "in the best position to decide if surgery or other procedures are necessary for his finger injury." *Id.* Dr. Hoppe says that as a psychiatry officer, he would not override or interfere in a specialist's treatment or plan of care. *Id.*, ¶ 13.

**D. Nursing Supervisor Edwards's Involvement**

Edwards avers that her position as a Nursing Supervisor was administrative in nature. ECF No. 26, ¶ 6. She did not evaluate, treat, or prescribe medications for any patient or directly provide medical care. *Id.* Instead, advanced care providers (physicians, nurse practitioners) were responsible for inmates' treatment decisions, care plans, and prescriptions. *Id.*, ¶ 7. She says nurses lack the authority to prescribe pain medication and must refer an inmate's request for stronger medication to his primary care provider. *Id.*, ¶ 12. Edwards avers that she adhered to providers' and outside specialists' medical decisions and treatment plans. *Id.*, ¶¶ 7–8.

Edwards says that WRC staff follow instructions from outside providers and followed Dr. Cullen's treatment plan for the plaintiff's finger amputation and post-operative care. *Id.*, ¶¶ 8–9, 14. That included providing the plaintiff pain medication, pillows to elevate his hand, and ice to treat his pain and swelling. *Id.*, ¶ 10. She notes that the

plaintiff's pain medication was ordered for him to take as needed, and the HSU promptly responded to his refill requests. *Id.*, ¶ 11. She avers that the plaintiff did not show typical signs of infection (smell, swelling, fever) when WRC staff treated him. *Id.*, ¶ 13.

## II. ANALYSIS

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Neither argument nor speculation is enough to defeat summary judgment. *See Ammerman v. Singleton*, 817 F. App'x 265, 268 (7th Cir. 2020) (citing *Herzog v. Graphic Packaging Intl, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)). To survive a motion for summary judgment, the non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### B. Eighth Amendment

As previously explained, the plaintiff's claim that the defendants denied him adequate medical care arises under the Eighth Amendment. ECF No. 10 at 4 (citing *Gabb*

*v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019); and *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To proceed on this claim, the plaintiff must present evidence showing that he "suffered from an objectively serious medical condition" and the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

To satisfy the objective component, the plaintiff must show that he had a medical condition "so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). To satisfy the subjective component, the plaintiff must show that the defendants knew the plaintiff faced "a substantial risk of serious harm . . . but then disregard[ed] that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to cruel and unusual punishment. *Farmer*, 511 U.S. at 838. Also as previously explained, "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." ECF No. 10 at 5 (quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)).

**C. Discussion**

The defendants do not dispute that the plaintiff's partially severed finger constitutes an objectively serious medical condition. I accepted for purposes of screening that it does, and I maintain that conclusion here. *See Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (finding that inmate's "openly dislocated finger" was an objectively serious medical condition); *Sallie v. Thiel*, 23 F. App'x 586, 589 (7th Cir. 2001) (concluding that partial amputation of inmate's finger, necessitating "a trip to the emergency room and weeks of

follow-up treatment," was sufficiently severe for Eighth Amendment claim). The only question is whether the defendants were subjectively aware of the plaintiff's medical condition and deliberately indifferent to its risk to his health.

The plaintiff in his response insists Dr. Hoppe or Edwards should have contacted Dr. Cullen or the HSU about the treatment of his finger to avoid further amputation. He says his complaints of extreme pain and signs of infection should have alerted the defendants of his need for emergent care. But the plaintiff did not file a declaration presenting a sworn version of events and submitted no evidence suggesting that either defendant knew or had reason to know his finger may be infected. His unsupported assertions about what happened are insufficient to create a genuine dispute of fact. *See Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012) (noting that "*argument* is insufficient to avoid summary judgment; the nonmoving party needs to come forward with *evidence*." (emphasis in original)).

It is undisputed that Dr. Hoppe, although a medical doctor, was not the plaintiff's advanced care provider at WRC. He was a psychiatry officer who was responsible for tending to the plaintiff's mental-health concerns only. It is undisputed that Dr. Hoppe does not address inmates' injuries or physical pain and did not do so for the plaintiff. Dr. Hoppe saw the plaintiff on only one relevant occasion, on September 3, 2019, during which the plaintiff expressed only "some apparent agitation" about his finger injury. ECF No. 27-1 at 27. Although the plaintiff requested a higher dose of gabapentin, there is no evidence that he expressed an urgent need for that medication. Moreover, the plaintiff understood that his gabapentin was limited to avoid a risk of him fainting or falling, as he had on August 21 or 22, 2019. *Id.* Dr. Hoppe was aware of the plaintiff's prescriptions for pain

medications, including gabapentin, tramadol, and Vicodin. But because he was not employed as a physician and was not treating the plaintiff's injury, he deferred to the primary care providers' recommendations and care plans.

The plaintiff asserts that Dr. Hoppe should have gotten involved after he complained that his medications were not controlling his pain. But he submitted no evidence—not even a declaration—suggesting that he told Dr. Hoppe that he needed emergent medical care different from his providers' treatment plan. It is undisputed that Dr. Hoppe did not know or have reason to know that the plaintiff needed different or emergent care. As the plaintiff's psychiatrist, and without any reason to suspect inadequate treatment, Dr. Hoppe cannot be held responsible for not interfering in the plaintiff's course of medical care. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Farmer*, 511 U.S. at 837, and *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)) (nonmedical prison official entitled to defer to medical provider unless he has "sufficient notice to alert him or her to 'an excessive risk to inmate health or safety'").

The same goes for Edwards, who had even less of a role in the plaintiff's care. It is undisputed that Edwards works in an administrative capacity and does not provide direct medical treatment for inmates. There is no evidence that she was involved in any stage of the plaintiff's finger injury treatment or that she ever examined or treated him. There is no evidence that Edwards was even aware of the plaintiff's medical condition or treatment until she reviewed his medical records in response to his inmate complaint about his treatment, which complaint she recommended dismissing.

The plaintiff insists that Edwards, in her role as a nursing supervisor, should be responsible for the care that all HSU nurses provided. But there is no supervisory liability

in suits under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Supervisors are responsible for only their own conduct, not the conduct of their subordinates. *Id.*; *Day v. Subsecretario del Sistema Penitenciario Federal*, 838 F. App'x 192, 193 (7th Cir. 2021). In her supervisory role, Edwards provided the plaintiff no medical care and was entitled to rely on the care provided by HSU staff unless she had reason to believe it was inadequate. *See Farmer*, 511 U.S. at 837–38. There is no evidence suggesting she did.

The plaintiff's medical records show he suffered a severe infection after his first surgery, which required a second surgery and further amputation. It is not clear whether the second surgery was necessitated by the plaintiff's actions—there is evidence he tampered with his dressings on at least one occasion—or by the treatment he received at WRC. It is possible that someone in the HSU knew or should have known that the plaintiff required emergent care sooner than it was provided. The plaintiff alleged in his inmate complaint that a non-defendant nurse apologized after his second surgery and told the plaintiff it would be a learning experience for the HSU. ECF No. 27-2 at 8–9. But the plaintiff did not name those nurses or providers as defendants in his complaint. He named Dr. Arboleda, who saw the plaintiff and treated his finger injury. But Dr. Arboleda is dead, and the plaintiff did not substitute his estate as a defendant. ECF Nos. 14, 17. Nor did he amend his complaint to name someone who treated him and may have been responsible for not providing treatment sooner.

The undisputed evidence shows the defendants were not responsible for the treatment of the plaintiff's finger and had no reason to believe that the HSU's treatment or care plan was inadequate. Therefore, no reasonable jury could conclude that they were

14
Case 2:20-cv-01727-LA   Filed 05/03/22   Page 14 of 16   Document 32

deliberately indifferent to his serious medical condition. The defendants are entitled to judgment as a matter of law.

### III. CONCLUSION

For the reasons described above, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 23) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 3rd day of May, 2022.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge